ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL XI DJ 2025-063

| | | |
|---|---|---|
| **NILDA AYALA MARTÍNEZ y ERNESTO PACHECO**<br><br>Recurridos<br><br>v.<br><br>**JUNTA DE DIRECTORES Y CONSEJO DE TITULARES DEL CONDOMINIO RIO MAR CLUSTER 1**<br><br>Recurrentes | TA2025RA00121 | **REVISIÓN** procedente del **Departamento de Asuntos del Consumidor**<br><br>Querella Núm.: **C-SAN-2022-0011655**<br><br>Sobre: Ley de Condominios |

Panel integrado por su presidenta, la Jueza Rivera Marchand, la Jueza Mateu Meléndez y la Jueza Boria Vizcarrondo.

Boria Vizcarrondo, Jueza Ponente.

### SENTENCIA

En San Juan, Puerto Rico, a 21 de octubre de 2025.

El 30 de julio de 2025, compareció ante nos la Junta de Directores del Consejo de Titulares del Condominio Río Mar Cluster I (parte recurrente) mediante el presente recurso de *Revisión Administrativa* y solicita que revoquemos la *Resolución Sumaria* emitida el 27 de mayo de 2025 por el Departamento de Asuntos del Consumidor (DACo).[1]

A través del referido pronunciamiento, el DACo, en lo pertinente, ordenó a la parte recurrente que pagara $7,613.25 y $1,219.83 al señor Ernesto Pacheco Pérez y a la señora Nilda Ayala Martínez (parte recurrida) por concepto de unos gastos de reparaciones de elementos comunes y elementos privativos del apartamento Villa 17-A en el Condominio Río Mar Cluster I.

---

[1] Sistema Unificado de Manejo y Administración de Casos (SUMAC) TA, Entrada Núm. 4, *Apéndice del Recurrente*, Apéndices I y XIV, págs. 1-19 y 594-613. Notificada el 29 de mayo de 2025.

Por los fundamentos que expondremos a continuación, modificamos la *Resolución Sumaria* recurrida y, así modificado, confirmamos el dictamen.

**I.**

El caso de autos tiene su génesis el 13 de julio de 2022, cuando la parte recurrida instó una querella ante el DACo, mediante un escrito intitulado *Formulario Presentación Querella Propiedad Horizontal,* en contra de la parte recurrente.[2] Esencialmente, indicó que, en diciembre de 2020, solicitó a la parte recurrente la reparación de un problema de filtración y humedad en Villa 17-A, de su apartamento en el Condominio Río Mar Cluster I, de lo cual, según adujo, no obtuvo respuesta. Asimismo, que, el 5 de octubre de 2021, se personó un abogado en representación de la Junta de Directores del condominio, quien realizó una inspección ocular del apartamento y les indicó que su problema era uno existente que podían repararlo sin la necesidad de contar con la autorización de la Junta de Directores ni del Consejo de Titulares del condominio.

En adición, sostuvo que se suscitó una controversia en relación con el área reparada y que le fue solicitada su demolición dentro del plazo de veinte (20) días. Además, la parte recurrente señaló la existencia de varias inobservancias. Específicamente, que no existía un reglamento desde 1975, que no se levantó un acta de aprobación de la distribución de los fondos provistos para reparaciones por daños ocasionados por el Huracán María, que no se distribuyeron los fondos adjudicados por una aseguradora para reparar ventanas, puertas, entre otros elementos, a los titulares, y que aún no se había respondido su petición para adjudicar el porciento de participación por unidad y atemperarlas a las extensiones significativas realizadas sin la aprobación del Consejo

---

[2] *Íd.*, Apéndice II, págs. 20-26.

de Titulares. Por último, señaló su inconformidad con una alegada alteración hecha por el presidente de la Junta de Directores a un jardín adyacente.

El 27 de diciembre de 2023, la parte recurrente presentó una *Contestación a Querella.*[3] En síntesis, negó los señalamientos esgrimidos en su contra y adujo que la escritura matriz del condominio cuenta con un reglamento adjunto, así como que la Junta de Directores contaba con un borrador de reglamento que anticipaba enviar a los titulares para su revisión y aprobación en una asamblea que se proponía a convocar el primer trimestre de 2024. De igual forma, sostuvo que, el 7 de diciembre de 2019, se celebró una asamblea en la que se aprobó un acta de distribución de fondos provistos por una aseguradora para proyectos de sellado de techo, restauración de tejas y pintura. Resaltó que, toda vez que la parte recurrida adquirió la titularidad del apartamento el 30 de diciembre de 2019, ésta no tenía legitimación para decidir sobre la indemnización ni la distribución de fondos que se acordó en la asamblea del 7 del mismo mes y año. Sin embargo, señaló que, el 23 de mayo de 2023, se celebró una asamblea extraordinaria en la cual se aprobó que el dinero restante provisto por el seguro fuese destinado a trabajos de sellado de techo, reparación de tejas y pintura, mientras que el restante sería utilizado de la cuenta de reserva. Finalmente, arguyó que el término para impugnar la decisión tomada en la asamblea ya había prescrito.

Así las cosas, el 2 de julio de 2024, la parte recurrente interpuso una *Solicitud de Desestimaci[ó]n o de Resoluci[ó]n Sumaria.*[4] En esencia, reiteró los argumentos esbozados en su contestación a la querella y planteó que la parte recurrida actuaba

---

[3] SUMAC TA, Entrada Núm. 4, *Apéndice del Recurrente*, Apéndice V, págs. 30-60.
[4] SUMAC TA, Entrada Núm. 4, *Apéndice del Recurrente,* Apéndice VIII, págs. 198-224.

en contra de sus propios actos al cuestionar si uno de los titulares eliminó un área de un jardín adyacente. Ello toda vez que la Junta de Directores le comunicó a la parte recurrida una solicitud para que removiera el cemento que instaló al reparar el problema de filtración.

En respuesta, el 23 de julio de 2024, la parte recurrida instó una *Moción en Oposición a Desestimación.*[5] En síntesis, adujo que su apartamento sufrió daños en elementos comunes como lo son las ventanas y la puerta de entrada, así como que los reparó a su costo por la suma de $7,613.25. Resaltó que la reparación fue hecha sin que se hubiera distribuido el dinero de la aseguradora por los daños causados por el Huracán María. Esgrimió que reclamó infructuosamente el reembolso de los gastos efectuados en las referidas reparaciones, de manera que la parte recurrente pretendía beneficiarse de un enriquecimiento injusto.

Igualmente, resaltó que el representante legal de la Junta de Directores inspeccionó el problema de filtración y notificó que el mismo era uno existente, cuya reparación no requería el aval del Consejo de Titulares. No obstante, según señaló la parte recurrida, la Junta de Directores se retractó de lo anterior y le exigió la demolición de la obra aun cuando ha aprobado o no se ha opuesto a las alteraciones que otros titulares han efectuado. En ese sentido, sostuvo que la Junta de Directores estaba impedida de solicitar la demolición de las reparaciones.

Finalmente, esgrimió que en una asamblea celebrada el 11 de septiembre de 2021, el Consejo de Titulares acordó de forma unánime la enmienda a los "*By Laws*" del condominio y la revisión de los porcientos de participación de cada unidad. A tal respecto, expuso que varias unidades han sido modificadas y aumentadas en

---

[5] *Íd.*, Apéndice IX, págs. 225-504.

sus pies cuadrados de área y no se han actualizado las cuotas de manera que sean proporcionales a las unidades, en incumplimiento del mandato del Consejo de Titulares.

El 29 de julio de 2024, la parte recurrente presentó una *R[é]plica a Moci[ó]n en Oposici[ó]n a Desestimaci[ó]n.*[6] Señaló que la parte recurrida no controvirtió el argumento de que la impugnación de los acuerdos sostenidos en la asamblea celebrada el 23 de mayo de 2021 ya había prescrito. De igual forma, que prescribió la oportunidad de impugnar la ratificación de dichos acuerdos en una asamblea extraordinaria celebrada el 24 de marzo de 2024.

Asimismo, reiteró sus planteamientos de que los fondos de los cuales la parte recurrida solicitó el reembolso fueron utilizados en los trabajos aprobados en la asamblea. Destacó, igualmente, que la parte recurrida participó de la asamblea en la que se ratificó el uso de los fondos, aunque votó en contra de ello. No obstante, los fondos fueron asignados por el voto mayoritario de los titulares. En ese sentido, le correspondía a la parte recurrida impugnar el acuerdo suscrito oportunamente.

Tras varios incidentes procesales, el 27 de mayo de 2025, el DACo emitió la *Resolución Sumaria* de la que se recurre.[7] En el referido dictamen, el foro administrativo constó las siguientes determinaciones de hechos:

1. La parte aquí Querellante, Nilda Ayala Martínez y Ernesto Pacheco es titular del Apartamento del Condominio Rio Mar Cluster I. Adquirió dicha propiedad mediante escritura número ciento cuarenta (140) sobre compraventa otorgada el treinta (30) de diciembre de dos mil diecinueve (2019) ante el notario Tania E. Santiago.

2. El Condominio Rio Mar Cluster I está sometido al Régimen de Propiedad Horizontal.

3. Cuando la parte querellante adquirió el apartamento, este había sido afectado por el [H]uracán María en el año 2017.

---

[6] SUMAC TPI, Entrada Núm. 4, *Apéndice del Recurrente*, Apéndice X, págs. 505-529.
[7] SUMAC TPI, Entrada Núm. 4, *Apéndice del Recurrente*, Apéndices I y XIV, págs. 1-19 y 594-613. Notificada el 29 de mayo de 2025.

4. Se sometió a Triple S [P]ropiedad una reclamación por los daños causados por el huracán.

5. La reclamación que se sometió a Triple S Propiedad incluía daños a la fachada, entre los que se encuentran elementos comunes como ventanas, puertas de entrada, marcos de puerta y ventana, plastering y pintura.

6. La villa 17-A de Rio Mar, se documentaron múltiples daños que formaron parte de la reclamación #1344511 que preparó Effective Claims Management (ECM) para la aseguradora Triple S Propiedad.

7. Cuando los querellantes adquirieron la Villa 17-A, ya se había recibido una oferta de la [a]seguradora Triple S Propiedad por los daños que provocó el Huracán María en de [sic] Rio Mar Cluster. La misma se aprobó en una asamblea el día 7 de diciembre de 2019, sin embargo, aún no se había distribuido el dinero.

8. Así las cosas, los querellantes decidieron realizar los trabajos de reparación en la Villa 17-A para asegurar su propiedad y evitar que la misma se deteriorara. La parte querellante reparó los elementos comunes de la fachada para un total de $7,613.35. Esto incluyó las ventanas con cristal integrado, puerta heavy y su instalación.

9. En la [a]samblea celebrada el 7 de diciembre de 2019, se aprobó la oferta del [s]eguro Triple S Propiedad por los daños ocasionados al complejo Cluster I Rio Mar. Además, se aprobó el desglose de distribución del pago del seguro para los daños en el interior de los apartamentos y en sus áreas comunes. En esa [a]samblea[,] el Consejo de Titulares aprobó el Plan de Distribución.

10. El Acta de la Asamblea Extraordinaria el 7 de diciembre de 2019 recoge que se dijo que todo lo que es fachada, es decir, puertas y ventanas que fueron reclamadas, lo pagara el Condominio con la partida adjudicada por la [a]seguradora Triple S Propiedad.

11. El Consejo de Titulares de Rio Mar Cluster recibió la cantidad de $508,972.26 de la [a]seguradora Triple S Propiedad.

12. En el desglose de distribución circulado con la Convocatoria de la Asamblea Extraordinaria, se especifica que el Condominio Rio Mar Cluster I, se especificó que recibiría $234,480.09 por concepto de daños a las áreas comunes; $139,418.86 por concepto de techos y otras cantidades para reparación de verjas, iluminación, fuentes, áreas verdes y contenedor de basura.

13. La cantidad adjudicada por los elementos privativos de la Villa 17-A fue $1,219.83. No existe controversia entre las partes con relación a las cantidades adjudicadas a los elementos privativos de los apartamentos. La parte querellante aceptó recibir el pago de las cantidades indicadas por los elementos privativos, sin que se entienda que al aceptar el pago se renuncia a su reclamación de las reparaciones que hicieron a elementos comunes de la fachada.

14. La cantidad adjudicada por los elementos de fachada de la Villa 17-A fue de $1,462.51.

15. La parte querellante reclamó $7,613.35 por el pago de las reparaciones de elementos comunes de fachada y los $1,219.83 por concepto de los elementos privativos.

16. El Consejo de Titulares no le reembolsó a la parte querellante el dinero por concepto de reparaciones a elementos comunes de la fachada, ni de los daños privativos. La parte querellante presentó su querella en DAC[o] el 13 de julio de 2022.

17. El dinero relacionado a la reclamación de daños ocasionados por el Huracán María se comenzó a distribuir en el año 2021.

18. El asunto de las reclamaciones de reembolso por reparación de elementos de la fachada fue discutido ampliamente por la Junta de Directores del Condominio Rio Mar Cluster I.

19. Según surge de la Minuta de octubre 17 de 2021, se desprende que todos los miembros de la Junta estuvieron de acuerdo en esperar la evaluación del abogado relacionado a la distribución del seguro a las personas que estaban objetando el dinero que se estaba distribuyendo puesto que no se estaba reembolsando el dinero que algunos titulares pagaron por reparar elementos de la fachada.

20. Del inciso 9 de la minuta de la reunión celebrada el 14 de diciembre de 2021[,] se desprendió que el Lcdo. Roberto Rivera Ruiz, quien fungió como representante legal de la Junta de Directores, preparó un documento sobre distribución para áreas comunes generales y áreas privativas.

21. Del inciso 7 de la minuta de la reunión celebrada el 14 de marzo de 2022, los miembros de la Junta y el Lcdo. Rivera Ruiz acordaron reunirse para discutir los reportes ECM y la recomendación de distribución que preparó el mismo Lcdo. Rivera.

22. De la minuta del 14 de junio de 2022, surge que el Lcdo. Rivera Ruiz en la Asamblea sobre el seguro discutió que las ventanas y puertas iban a desembolsarse al Consejo y no a los titulares. El Consejo de [T]itulares aprobó el desglose dándole el dinero al consejo. No obstante, el Lcdo. Rivera Ruiz estableció que la Junta de Directores no puede quedarse con el dinero. Ni utilizarlo para otra cosa. Si el Consejo recibe el dinero tiene que reemplazar o arreglar las ventanas y puertas. En el caso de los titulares que objetaron, fueron titulares que arreglaron las ventanas a su costo y el Consejo no las arregló, por ende, le corresponde al Consejo reembolsar esos costos porque ya se hicieron esos arreglos. Pero se supone que el Consejo arregle las ventanas que el seguro determinó y pagó el dinero para arreglarlas.

23. La adjudicación que realizó la [a]seguradora Triple S, el dinero lo recibió el Consejo de Titulares para hacer las reparaciones de las áreas afectadas que son fachada, y surgió del Appraisal Report. El cual se desglosó a través de un tasador lo que correspondía pagar por cada apartamento. En la asamblea del año 2019, se discutió

que el Consejo de Titulares recibiría el dinero que corresponde a las áreas comunes.

24. El 30 de marzo de 2024, se celebró una Asamblea Extraordinaria, en donde se aprobó el uso de la cuenta de la reserva por la cantidad total de $127,000.00 dólares y un diez (10) porciento de contingencia en la cantidad de $12,700.00 para la pintura del Condominio y el arreglo de las tejas. La parte querellante estuvo presente y el voto fue en contra de los acuerdos y la parte querellada la solicitud de la parte querellante se encuentra prescrita e impide que este foro tome jurisdicción y adjudique remedio a esos efectos [sic].

25. Existe un precedente en DAC[o,] Resolución C-SAN-2023-0013145[,] notificada el 1 de abril de 2024. En dicha resolución[,] la parte querellante hizo los mismo planteamientos con relación a la aprobación de parte del consejo de Titulares del uso de fondos de la cuenta de reserva para pintar el edificio y cambiar las tejas. En la resolución expresó que "Aun presumiendo para efectos del análisis que dicha asamblea hubiese sido v[á]lida y vinculante, de manera alguna esto libera al Consejo de Titulares de su responsabilidad de reembolsar a la parte querellante el dinero que tuvo que invertir en la reparación de los elementos comunes que claramente era responsabilidad del Consejo de Titulares atender. Dicha alegada asamblea es un asunto totalmente independiente de la controversia planteada en la querella de epígrafe."

26. La asamblea a la que se hace referencia en el inciso anterior se celebró casi dos años después de instarse la querella de referencia. La [L]ey Núm. 104 del 25 de junio de 1958 era la ley vigente al momento de aprobarse el plan de distribución de Triple S Propiedad.

27. La parte querellante lleva más de dos años reclamando el pago de las reparaciones a los elementos comunes, por la cantidad de $7,613.25 dólares.

28. La asamblea que se celebró en marzo de 2024 no pudo tener el efecto de limitar el derecho de reembolso de un titular por una reparación de elementos de fachada que hizo a su costo. Particularmente cuando la ley claramente dispone que los titulares aportaran proporcionalmente a los gastos de mantenimiento para la conservación de los elementos comunes.

29. La parte querellante solicitó, que se atempere el Reglamento a la nueva Ley de Condominios vigente.

30. El querellante reclamó que aún no se ha respondido una petición para adjudicar el % de participación por unidad, ya que se han realizado extensiones significativas sin aprobación del Consejo de Titulares en violación de ley.

31. La parte querellante cursó varias comunicaciones a la Junta de Directores para que atendieran un problema de filtración y humedad que provenía de un área común limitada, que colinda por su apartamento. [...][8]

---

[8] SUMAC TPI, Entrada Núm. 4, *Apéndice del Recurrente,* Apéndices I y XIV, págs. 3-7 y 596-600.

En ese sentido, DACo determinó que la parte recurrida realizó reparaciones a los elementos comunes de la fachada, gestiones que correspondían a la parte recurrente, por lo que ésta debía reembolsar el gasto incurrido. Añadió que la asamblea en la que se dispuso el uso de los fondos no limitó el derecho de la parte recurrida de, en carácter de titular, solicitar el reembolso de los gastos a su costo de la reparación de elementos comunes.

Por otro lado, sobre el asunto referente a la construcción de cemento para reparar el problema de filtración, el DACo dispuso que debía atenderse por el Consejo de Titulares de modo que se uniformara la fachada y se delimitaran las áreas comunales de las privativas. Finalmente, resolvió que el condominio era regido por un reglamento aunque este no haya sido enmendado, y que la acción sobre la modificación de elementos comunes para uso personal correspondía al Consejo de Titulares, en adición a que ello no variaba, de por sí, el porciento de participación de cada titular.

Cónsono con todo lo anterior, el foro administrativo ordenó la celebración de una asamblea para atender el asunto de la uniformidad de la fachada y los elementos comunes. En adición, ordenó a la parte recurrente al pago de $7,613.25 y $1,219.83 a favor de la parte recurrida.

Inconforme, el 16 de junio de 2025, la parte recurrente presentó una *Moci[ó]n de Reconsideraci[ó]n.*[9] Esencialmente, solicitó la reconsideración del pago de la suma de $7,613.25 por entender que no corresponde al plan de distribución aprobado por el Consejo de Titulares. Más bien, arguyó que los gastos incurridos por la parte recurrida en la reparación de la puerta y las ventanas no corresponden a los elementos originales del condominio sino que constituyen una mejora.

---

[9] SUMAC TPI, Entrada Núm. 4, *Apéndice del Recurrente*, Apéndice XV, págs. 614-651.

Añadió que la evaluación hecha por la tasadora, para valorar el apartamento con respecto al seguro, correspondió a una puerta de entrada de madera y no a una puerta "*heavy*" de aluminio, por un valor de $1,140.00, y las ventanas, por un valor de $224.00, para una suma global de $1,364.00. En ese sentido, solicitó al DACo que redujera la cantidad pagadera de $7,613.25.

Sin embargo, la agencia no emitió determinación alguna para rechazar de plano la solicitud de reconsideración o para acogerla y atenderla en sus méritos.

Aun inconforme, el 30 de julio de 2025, la parte recurrida presentó ante nos un recurso de *Revisión Administrativa*, mediante un escrito intitulado *Petición*, y señala al foro administrativo por la comisión de los siguientes errores:

1. **Erró el DAC[o] al no considerar que el informe que preparó Effective Claims Management el 20 de septiembre de 2018, establece cu[á]les fueron los daños causados por el Huracán María a los elementos de fachada de la villa 17-A, en la cantidad de $1,462.51.**

2. **Erró el DAC[o] en la apreciación de que el estimado en la cantidad de $7,613.25, de 21 de agosto de 2020, se refiere a los daños ocasionados por el Huracán María a los elementos comunes de fachada de la villa 17-A.**

3. **Erró el DAC[o] al determinar que la parte querellada-recurrente debe pagar la cantidad de $7,613.25 cuando del expediente no obra ni reclamación de dicha cuantía a la Junta de Directores, ni prueba de pago y los materiales que se desglosan no corresponden a elementos comunes de fachada ni a los elementos de fachada originales en madera del condominio.[10]**

De otro lado, el 1 de octubre de 2025, la parte recurrida compareció ante nos mediante un *Alegato de la Parte Recurrida*.[11] Con el beneficio de la comparecencia de ambas partes y el expediente ante nos, procedemos a disponer del recurso ante nuestra consideración, no sin antes delimitar el marco jurídico aplicable.

---

[10] SUMAC TA, Entrada Núm. 1, pág. 6 (énfasis en el original).
[11] *Íd.*, Entrada Núm. 8.

## II.

### A.

El Artículo 4.006 (c) de la *Ley de la Judicatura* de 2003, Ley Núm. 201-2003, 4 LPRA sec. 24y, faculta al Tribunal de Apelaciones a atender las decisiones, órdenes y resoluciones finales de organismos o agencias administrativas. Al momento de revisar una decisión administrativa, el principio rector es el criterio de la razonabilidad de las decisiones y actuaciones de la agencia. *Hernández Feliciano v. Mun. Quebradillas*, 211 DPR 99 (2023); *Torres Rivera v. Policía de PR*, 196 DPR 606 (2016); *IFCO Recycling v. Aut. Desp. Sólidos*, 184 DPR 712 (2012). Todas las decisiones administrativas gozan de una presunción de legalidad y corrección, por lo cual la parte que las impugne debe producir suficiente evidencia para derrotarla. *Íd.*

Las facultades adjudicativas de una agencia están regidas por la Ley Núm. 38 de 30 de junio de 2017, según enmendada, mejor conocida como la *Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico*, 3 LPRA sec. 9601 *et seq.* (LPAU), y por la jurisprudencia aplicable. La Sección 3.1 de la LPAU, 3 LPRA sec. 9641, requiere que las agencias fundamenten sus resoluciones con determinaciones de hecho y conclusiones de derecho. Estas determinaciones deben reflejar que se consideraron y resolvieron los conflictos de prueba y, además, deben describir tanto los hechos probados como los rechazados. *Empresas Ferrer v. ARPe*, 172 DPR 254, 265 (2007). Por lo tanto, la facultad revisora de los tribunales se enfoca en determinar: (1) que el remedio concedido por la agencia fuese el apropiado; (2) si las determinaciones de hecho estuvieran basadas en evidencia sustancial que obre en el expediente administrativo; y (3) si las conclusiones de derecho fueron correctas mediante su revisión completa y absoluta. Sección 4.5 de la LPAU, 3 LPRA sec. 9675.

En cuanto a nuestra facultad revisora, el Tribunal Supremo de Puerto Rico ha expresado que, al revisar las determinaciones de hechos, los tribunales solo pueden sustituir su criterio por el de la agencia cuando las determinaciones no están fundamentadas en evidencia sustancial. *Hernández Feliciano v. Mun. Quebradillas, supra*, pág. 115. "Evidencia sustancial es 'aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión'". *Empresas Ferrer v. ARPe, supra*, pág. 266 (citando a *Hernández, Álvarez v. Centro Unido*, 168 DPR 592, 615 (2006)). La parte que impugne una determinación "tiene que convencer al tribunal de que la evidencia en la cual se apoyó la agencia para formular tales determinaciones no es sustancial". *Otero v. Toyota*, 163 DPR 716, 728 (2005).

Por otro lado, en *Vázquez v. Consejo de Titulares*, 2025 TSPR 56, nuestro Máximo Foro local revisitó el trato que los tribunales han de concederle a las determinaciones de hecho de las agencias administrativas. Lo anterior, a la luz del marco jurídico establecido por la Sección 4.5 de la LPAU, 3 LPRA sec. 9675, y lo resuelto por el Tribunal Supremo de Estados Unidos en *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).

Según la referida sección, las conclusiones de derecho "serán revisables en todos sus aspectos por el tribunal". Nuestro Más Alto Foro local indicó que ha sostenido, en reiteradas ocasiones, que las conclusiones e interpretaciones de las agencias merecían gran consideración, y que la revisión judicial se limitaba a determinar si estas habían actuado arbitraria o ilegalmente. *Vázquez v. Consejo de Titulares, supra*. Sin embargo, advirtió que esta consideración no equivalía a una renuncia de nuestra función revisora. Conforme a *Loper Bright Enterprises v. Raimondo, supra*, el Tribunal Supremo de Puerto Rico concluyó que la interpretación de la ley "es una tarea que corresponde inherentemente a los tribunales". *Vázquez v.*

*Consejo de Titulares, supra.* Por lo tanto, será deber de los tribunales revisar las conclusiones de derecho de las agencias en todos sus aspectos, guiados por los mecanismos interpretativos propios de los tribunales y no de las agencias.

Conforme a la nueva normativa, los tribunales deben ejercer un juicio independiente al de la agencia administrativa, cuando les corresponde decidir si una agencia ha actuado dentro del marco de las facultades que se le han delegado estatutariamente. *Vázquez v. Consejo de Titulares, supra.* No obstante, contrario a la práctica pasada, los tribunales no vienen obligados a darle deferencia a las interpretaciones de derecho realizadas por las agencias administrativas simplemente cuando la ley es ambigua. *Íd.* Interpretando *Loper Bright Enterprises v. Raimondo, supra,* concluye que esto es así pues son los tribunales, bajo su función judicial, los que deben ejercer un juicio independiente al determinar el significado de las disposiciones estatutarias interpretadas por las agencias administrativas. *Íd.*

El Tribunal Supremo de Puerto Rico aclara que, al ejercer dicho criterio, los tribunales pueden apoyarse de las interpretaciones realizadas por las agencias, pues son estas las que tienen responsabilidad de aplicar ciertas leyes. *Íd.* No obstante, indicó que "tales interpretaciones 'constituyen un acervo de experiencias y criterios informados a los cuales los tribunales y los litigantes bien podrán recurrir a modo de guía' de conformidad con la APA; y no avalar ciegamente, como se solía hacer en el pasado." *Íd.*

**B.**

Con anterioridad a la promulgación de la Ley Núm. 129 de 16 de agosto de 2020, según enmendada, mejor conocida como la *Ley de Condominios de Puerto Rico de 2020*, 31 LPRA sec. 1921 *et seq.*, los inmuebles sometidos al régimen de propiedad horizontal eran

regidos por la Ley Núm. 103 de 25 de junio de 1958, según enmendada, mejor conocida como la *Ley de Condominios*, 31 LPRA ant. sec. 1291 *et seq.* (Ley de Condominios).

Entre sus disposiciones, el Artículo 11 de la Ley de Condominios, 31 LPRA ant. sec. 1291i, estableció que algunos elementos de los condominios eran comunes generales necesarios, y no susceptibles de propiedad individual por los titulares, sino que estarían sometidos a un régimen de indivisión forzosa. Asimismo, en ánimos de que el listado de los elementos mencionados en el referido articulado no fuera uno taxativo, se dispuso que "[c]ualquier otro elemento que fuere indispensable para el adecuado disfrute de los apartamientos en el inmueble" sería considerado como elemento común general y necesario. *Íd.*

Cónsono con lo anterior, y pertinente al asunto de marras, la fachada de un edificio es considerada un bien de uso común, dado que es racionalmente necesaria para la existencia, conservación, seguridad y disfrute del apartamento por su titular. *Junta Dir. Con. Montebello v. Torres*, 138 DPR 150, 155-156 (1995). Lo anterior se reflejaba, igualmente, en el Artículo 15 de la Ley de Condominios, 31 LPRA ant. sec. 1291m, toda vez que le impedía a los titulares el realizar mejoras, modificaciones, reparaciones y limpieza que cambiaran la forma externa de las fachadas. Es decir, se prohibía que un titular pudiera, por su cuenta, alterar la fachada o decorar las puertas, paredes o ventanas de forma que afectara el conjunto arquitectónico y estético del edificio. *Junta Dir. Con. Montebello v. Torres*, *supra*, a la pág. 155.

La naturaleza común de la fachada, de la cual un titular adquiere una parte indivisa, les imputa a los demás titulares la obligación de contribuir proporcionalmente a los gastos incurridos por el condominio para conservarla y mantenerla. *Íd.*, a la pág. 156. Ello se desprendía del Artículo 39 de la Ley de Condominios, 31

LPRA ant. sec. 1293c, el cual le imponía a cada titular la responsabilidad de contribuir proporcionalmente a los gastos de administración, conservación y reparación de los elementos comunes generales del condominio.

No obstante lo anterior, el Artículo 17 de la antedicha ley disponía lo siguiente:

> Cuando el inmueble o sus elementos comunes requieran **obras urgentes o necesarias de reparación, seguridad o conservación, cualquier titular podrá hacerlas a sus expensas y repetir contra los demás para el pago proporcional de los gastos hechos, mediante justificaciones pertinentes.**
>
> En el caso de obras urgentes o necesarias, la repetición del gasto procederá, siempre y cuando la Junta de Directores, una vez notificada, hubiese dejado de actuar con la diligencia que ameriten las obras en cuestión, **salvo situaciones de emergencia**. El reembolso deberá solicitarse no más tarde treinta (30) días de efectuado el gasto. La Junta verificará la solicitud de reembolso y, de proceder, realizará el pago en un término de treinta (30) días, si el mismo no excede el 10% del presupuesto, en cuyo caso se procederá conforme al Artículo 38(d)(2). Salvo que así lo autorice la Junta, el titular no podrá compensar dicho crédito con la deuda de mantenimiento. **En ningún caso procederá la realización por un titular de las obras necesarias o el reembolso, si el Consejo de Titulares ha decidido posponerlas o no efectuarlas.** El titular que se sienta perjudicado por tal decisión podrá solicitar el auxilio de la autoridad competente.
>
> 31 LPRA ant. sec. 1291o (énfasis suplido).

La Ley de Condominios, *supra*, estableció el Consejo de Titulares como "la autoridad suprema sobre la administración del inmueble sometido al régimen de propiedad horizontal." *Íd.*, ant. sec. 1293b. Éste constituye el organismo rector y deliberativo del gobierno interno de un condominio, al cual, como parte de sus deberes, le corresponde elegir la composición de la Junta de Directores, el órgano ejecutivo de la comunidad de titulares. *Íd.*; *Consejo de Titulares v. Gómez Estremera et al.*, 184 DPR 407, 417-418 (2012).

Pertinente al caso de autos, el Artículo 44 de la Ley de Condominios, *supra*, disponía sobre el procedimiento que la Junta de Directores lleva a cabo referente a la indemnización provista por un seguro que cubra al inmueble en el caso de un siniestro.

En particular, el referido artículo disponía como sigue:

Luego de recibir del asegurador una oferta de indemnización, la Junta de Directores preparará un plan de distribución de los fondos para la reconstrucción, detallando las cantidades específicas que habrán de destinarse a la reconstrucción de cada apartamiento, conforme a las tasaciones realizadas, y a las restantes áreas comunes del inmueble. El informe se circulará a los titulares con no menos de quince (15) días de antelación a la celebración de una asamblea extraordinaria, convocada para considerar, exclusivamente, las ofertas presentadas y el referido informe. El Consejo de Titulares decidirá finalmente, por voto mayoritario, todo lo relacionado a la indemnización, incluidas la aceptación de las sumas ofrecidas por las compañías aseguradoras y las prioridades de las obras a realizarse.

Si el Consejo de Titulares decidiera recibir la suma total de la indemnización para distribuirla luego entre los condóminos, los dineros se depositarán en una cuenta especial, de la cual sólo podrán efectuarse retiros previa certificación jurada del Tesorero y del Secretario en la que se acredite el acuerdo del Consejo de Titulares en el que se autoriza el retiro de fondos y que el mismo no ha sido impugnado en ningún foro judicial o administrativo.

[...]

31 LPRA ant. sec. 1293h.

Expuesta la normativa jurídica aplicable, procedemos a disponer del asunto ante nuestra consideración.

### III.

En el presente caso, la parte recurrente señala a DACo por la comisión de tres (3) errores. En primer lugar, sostiene que el recurrido foro administrativo no consideró un informe preparado el 20 de septiembre de 2018 por una ajustadora en el cual se establece la valorización de los daños sufridos en la fachada del apartamento de la parte recurrida. No le asiste la razón.

Contrario a lo que sostiene la parte recurrente, el foro administrativo, efectivamente, tomó en consideración el informe que preparó la ajustadora para llevar a cabo su determinación. Y es que de una lectura de la *Resolución Sumaria* recurrida refleja que DACo determinó como un hecho adjudicativo que la cantidad valorada por la ajustadora Effective Claims Management, de los daños a la fachada del apartamento de la parte recurrida, como consecuencia del paso del Huracán María, fue de $1,462.51. Ello se desprende de

las determinaciones de hechos número siete (7) y catorce (14), las cuales exponen:

> 7. Cuando los querellantes adquirieron la Villa 17-A, ya se había recibido una oferta de la [a]seguradora Triple S Propiedad por los daños que provocó el Huracán María en de [sic] Rio Mar Cluster. La misma se aprobó en una asamblea el día 7 de diciembre de 2019, sin embargo, aún no se había distribuido el dinero.
>
> [...]
>
> 14. **La cantidad adjudicada por los elementos de fachada de la Villa 17-A fue de $1,462.51.**[12]

Por ende, es forzoso concluir que la agencia administrativa sí consideró y adoptó como un hecho la suma que estimó la ajustadora al valorar los daños sufridos en el inmueble por el paso del evento atmosférico. Ello nos conduce a discutir el segundo y tercer señalamiento de error, lo cual haremos conjuntamente, por estar ambos íntimamente relacionados.

Específicamente, la parte recurrente arguye que el DACo erró al apreciar que el estimado de $7,613.25 se refiere a daños ocasionados por el Huracán María y, asimismo, al ordenarle que pagara la referida cuantía a pesar de que no obró en el expediente una reclamación de dicha suma a la Junta de Directores ni una prueba de pago, en adición a que los materiales desglosados en el estimado no corresponden a los elementos originales de la fachada.

En primer lugar, destacamos que la parte recurrente esbozó el planteamiento sobre la diferencia entre los materiales utilizados por la parte recurrida en la reparación de los daños y los originales que tenían los elementos de fachada, por primera vez, en su petitorio de reconsideración del dictamen recurrido. Por consiguiente, DACo no consideró dicho argumento. Como vimos, los planteamientos que esgrimió la parte recurrente ante el foro administrativo fueron ceñidos, esencialmente, a que el foro administrativo carecía de

---

[12] SUMAC TPI, Entrada Núm. 4, *Apéndice del Recurrente*, Apéndices I y XIV, págs. 4-5 y 597-598 (énfasis suplido).

jurisdicción por la falta de impugnación de los acuerdos tomados por el Consejo de Titulares en la asamblea celebrada el 24 de marzo de 2024. No obstante, su reclamo no versa en si los elementos utilizados por la parte recurrida son iguales a los elementos originales de la fachada, sino que impugna la suma monetaria que el foro administrativo determinó que debía pagar a favor de la parte recurrida por sus inversiones en la reparación.

En ese sentido, resaltamos que la parte recurrida no presentó pagos ni facturas sobre la reparación hecha, más bien presentó un desglose de una cotización o estimado de los materiales utilizados para ello, al igual que fotos de la instalación de las ventanas y la puerta, en aras de justificar la cuantía reclamada. **Sin embargo, no procede el reembolso de $7,613.25, por lo que le asiste la razón a la parte recurrente**. Nos explicamos.

De una revisión y análisis del expediente ante nos, no se desprende que la parte recurrida haya solicitado a la parte recurrente el permiso para realizar las reparaciones conforme a la cotización que presentó. Más bien, del expediente surge una misiva de 22 de abril de 2023 en la que la parte recurrida reclamó $1,103.35 por los "elementos de la fachada".[13]

Como vimos, el Artículo 17 de la Ley de Condominios, 31 LPRA ant. sec. 1291o, únicamente reconoce, como excepción al permiso requerido del Consejo de Titulares para las obras de reparación, una situación de emergencia. Sin embargo, en el presente caso, el Consejo de Titulares aprobó la oferta de la aseguradora en diciembre de 2019 y la cotización de los materiales presentada por la parte recurrida consta del 21 de agosto de 2020. Es decir, las reparaciones realizadas por la parte recurrida se efectuaron casi un (1) año después de la aprobación de la oferta y más de dos (2) años después

---

[13] SUMAC TPI, Entrada Núm. 4, *Apéndice del Recurrente,* Apéndice IX, Anejo VI, págs. 295-334.

del paso del Huracán María, de manera que no se trató de una situación que constituyera una emergencia y, por ende, se pudiera prescindir de la aprobación del Consejo de Titulares.

En fin, toda vez que las reparaciones no contaron con la aprobación del Consejo de Titulares, y no se realizaron dentro del contexto de una situación de emergencia, el DACo erró al imponerle a la parte recurrente el pago de $7,613.25.

Como vimos, el Consejo de Titulares aprobó la oferta de la aseguradora, la cual incluía que se le concediera a la parte recurrida la suma de **$1,462.51** por los "elementos comunes de la fachada". En ese sentido, colegimos que corresponde modificar el dictamen emitido por DACo a los únicos fines de que la cuantía que debe ser pagada por la parte recurrente a favor de la parte recurrida, sea de **$1,462.51** en lugar de $7,613.25.

**IV.**

Por las razones discutidas anteriormente, modificamos la *Resolución Sumaria* recurrida y, así modificada, se confirma.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones